UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABIMAEL MANSO-DIAZ,                    :
                                       :
              Plaintiff,               :
                                       :    CIVIL ACTION NO. 05-192E
       v.                              :
                                       :    JUDGE McLAUGHLIN
                                       :
WARDEN JAMES SHERMAN,                  :    *(Electronic Filing)*
                                       :
              Defendant.               :

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

AND NOW, comes Defendant, Warden James F. Sherman, through his attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania and Michael C. Colville, Assistant U.S. Attorney, for said district and files the following Motion to Dismiss, or in the alternative, Motion for Summary Judgment.

I.    **BACKGROUND**:

Plaintiff is Abimael Manso-Diaz, Register Number 09105-055, a federal inmate who is currently residing at the Volunteers of America Community Corrections Center (CCC), 175 Ward Street, Rochester, NY 14605. On July 25, 1995, he was sentenced in the United States District Court for the Western District of New York to a three month term of imprisonment with a one year term of supervised release to follow for Forged Endorsement of a United States Treasury Check, in violation of 18 U.S.C. § 510©). He commenced services of this sentence on November 21, 1997. On or about February 18, 1998, he satisfied this sentenced and was released from his three month term of imprisonment. On August 26,

1998, a four month supervised release violator term was imposed. On or about October 30, 1998, he satisfied this term, and was released.

On or about November 13, 2003, he was sentenced in the United States District Court for the Western District of New York to a six month term of imprisonment followed by a one year term of supervised release for Theft of Government Property, in violation of 18 U.S.C. § 641. He commenced service of this term on November 13, 2002, and on May 11, 2004, he was released to his term of supervised release upon satisfaction of his sentence.

On February 21, 2005, a two month, 20 day supervised release violator term of imprisonment was imposed. He commenced service of this term on February 21, 2005. His projected satisfaction date is May 10, 2005. See **Document 1a**, Public Information Data, attached to the Declaration of Joyce Horikawa.

Plaintiff, through counsel, has filed the complaint under the Federal Tort Claims Act, 28 U.S.C. § 2670, et seq. ("FTCA"), and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) (hereinafter "Bivens"). He alleges the defendant was deliberately indifferent to his serious medical needs and/or provided negligent medical care to him while he was incarcerated at FCI McKean. Specifically, he contends that on March 7, 2004, at 4:00 pm, he was sleeping, because he was prescribed medication for cerebral palsy, scoliosis, asthma and

2

adjustment disorder.  He alleges that he was forcibly roused from his sleep by officers who were conducting the standing count at the Federal Correctional Institution (FCI), McKean, Pennsylvania, and taken to the Special Housing Unit (SHU) with his hand in restraints behind his back.  Plaintiff alleges he was housed in the SHU for three days without medical care, and he was forced to sleep on the floor.  He alleges that the above-described treatment constitutes deliberate indifference in violation of the Eighth Amendment. Plaintiff also contends that the above-described treatment constitutes negligence.  As relief, he seeks $150,000.00 for the constitutional claim and $250,000.00 for the negligence cause of action.

However, Plaintiff has not exhausted his available administrative remedies on any issue raised in this civil action. See **Document 1**, Declaration of Joyce Horikawa.

**II.  STATEMENT OF FACTS:**

On December 16, 2003, Plaintiff was designated to the Federal Correctional Institution (FCI), McKean.  See **Document 1a**, at p. 1, attached to the Declaration of Joyce Horikawa.  Upon admission to FCI McKean, he was assigned to a bed in general population.  See **Document 1b**, at p. 1, Inmate History, Quarters for inmate Abimael Manso-Diaz, Reg. No. 09105-055, attached to the Declaration of Joyce Horikawa.

On or about December 16, 2003, a Medical Summary of Federal Prisoner/Alien in Transit form was completed by the Immigration and Naturalization Service (INS), Health Services Division, Buffalo, New York. The form indicated Plaintiff had the following medical problems: (1) cerebral palsy; (2) scoliosis secondary to cerebral palsy; (3) Gastroesophageal Reflux Disease ("GERD"); (4) chronic asthma; (5) allergies to aspirin; and (6) adjustment disorder. He traveled with the following medications: (1) Baclofen; (2) Zantac; (3) Celebrex; (4) Albuterol; and (5) Triamcinolone. The form indicated he was able to travel by bus, van or car; he was medically able to travel by airplane; he was able to stay overnight at another facility en route to his destination; there were no medical reasons for restricting the length of time he could be in travel status; and he did not require any medical equipment while in transport status. There was no indication from this form Plaintiff needed special mattresses or that he could not be handcuffed behind his back. See **Document 2a**, at p. 21, Medical Record of Abimael Manso-Diaz, Reg. No. 09105-055, attached to the Declaration of Dennis Olson, M.D.

On December 16, 2003, an intake medical history report was prepared at FCI McKean. It noted Plaintiff had a prior medical history of cerebral palsy, asthma, scoliosis, GERD, and adjustment disorder. It was also noted Plaintiff was taking the following medications: (1) Albuterol, (2) Triamcinolone, (3) Zantac, (4)

4

Baclofen, and (5) Celebrex.  It was noted Plaintiff needed a bottom bunk.  Id., at pp. 20, 31, 33.

On December 17, 2003, an intake medical examination was conducted.  Plaintiff reported he had decreased use of his left lower extremities with noticeable decreased sensation and warmth of the left lower extremities.  He reported paralysis of his left upper extremity, cerebral palsy with decreased use of his left lower and upper extremities.  He reported over three prior surgeries to the tendons in his feet, with the most recent surgery done in 2002.  He noted his back and spine were affected by scoliosis and by an accidental fall.  Plaintiff indicated he usually used a wheelchair, and he listed to his left side.  Tattoos were observed on his right leg, right biceps, right back, and he had scars on his left foot.  The nurse noted Plaintiff was a 37 year old male with cerebral palsy, scoliosis, and chronic pain.  Plaintiff stated he took medication for muscle spasms and pain, but did not recall the names of the medications.  He stated he was allergic to aspirin (it caused a rash).  He indicated pasta caused his lips to swell, and he smoked five cigarettes a day for 20 years.  It was recommended Plaintiff be placed in the general clinic for cerebral palsy and pain.  Id., at pp. 29-30.  Plaintiff was prescribed the following medications: (1) Zantac; (2) Albuterol (inhaler); and (3) Azmacort (inhaler).  He was issued an unlimited use wheelchair pass.  Id., at pp. 19, 38.  The Clinical Director

indicated that he would hold off on prescribing Celebrex. Id., at p. 19. Plaintiff was assigned to the Chronic Care Clinic (CCC) for regular check-ups. Id., at p. 30. He was issued a lower bunk pass and was placed on medically unassigned status. Id., at p. 30, 33, 37-38.

Later on December 17, 2003, it was noted Plaintiff had increased cerumen (ear wax) in his left ear, and no complaints. He was in no acute distress. His right ear canal was clear. He was assessed with cerumen impaction of the left ear. He was given ear wax drops and instructed to clean his left ear each night for five nights. He was instructed to return in five days for a follow-up. Id., at p. 17.

On December 22, 2003, Plaintiff returned with complaints of body pains. He indicated he was out of Celebrex and requested muscle relaxers. On observation, it was noted he had no ear wax. He was assessed with cerebral palsy/scoliosis status post cerumen (resolved). He was prescribed Naproxen and issued a six month soft shoe pass. Id., at pp. 17, 38.

On January 22, 2004, Plaintiff was seen in the CCC. Plaintiff reported pain in the back to his hips. He stated he it was hard to walk, and no one wanted to push his wheelchair. He stated he took Baclofen for two months, but it did not help him. After an examination, he was assessed with cerebral palsy, asthma, GERD, and scoliosis. Plaintiff stated that on a scale of one to ten, with

ten being the greatest, his pain level was a 15. Plaintiff was tapered off of Baclofen. His prescriptions for Albuterol, Azmacort, Naproxen and Rantidine were renewed. Id., at pp. 15-16. Also on this date, a medical slip was issued directing Plaintiff be given the thickest available mattress. Id., at p. 39.

On January 26, 2004, Plaintiff complained of a spinal problem. He stated that since arriving at FCI McKean, he experienced 30 minutes of paralysis of his lower extremities each morning upon arising from bed. He stated his mattress was too thin. He stated he went to the Warden and the Warden told staff to get him a better mattress. However, staff were unable to get him a better mattress. Plaintiff was assessed with cerebral palsy and scoliosis. Staff were ordered to check with the Clinical Director and correctional staff regarding the mattress issue. Id., at p. 13.

On that same date, an administrative notation was entered indicating Plaintiff complained of strong burning pain, at a level of 10 on a scale of one to ten. He indicated he experienced this pain all day, every day. He stated it felt like his bones were grinding from his back to his lower leg. It was noted Plaintiff was taking Baclofen (Lioresal) and Naproxen, and the pain was worse when he was upright and walking. He indicated the pain decreased when his legs were down, if he had a soft mattress. It was noted Plaintiff refused to take Elavil at pill line. The Physician's Assistant noted the staff physician directed that no other pain

medication would be available to Plaintiff until he was willing to report to pill line to take Elavil.  It was noted the mattress issue was forwarded to Plaintiff's unit team for resolution.  Id., at p. 13.

On January 27, 2004, It was noted that Plaintiff's Unit Manager issued him two mattresses, and Plaintiff would receive an old style fabric mattress upon his request if one was available. Id., at p. 14.

On March 7, 2004, Incident Report Number 1199142 was issued, charging Plaintiff with Interfering with the Taking of the Count (Code 321) and Refusing to Obey an Order (Code 307).  See **Document 3a**, Incident Report Number 199142, attached to the Declaration of Monica Recktenwald.  The incident report alleged that on March 7, 2004, at approximately 4:15 p.m., while taking the stand up count, the reporting officer approached Plaintiff's cell.  He observed Plaintiff lying on his bunk.  He ordered Plaintiff to get out of his bed and stand for the count.  Plaintiff did not get up.  The officer ordered him once more to stand up and Plaintiff stated, "this is bullshit."  He did not obey the order to stand for the standup count.  The officer had to stop the count.  Id.

At approximately 5:00 p.m. on March 7, 2004, Plaintiff was placed in Administrative Detention (AD), pending investigation into the incident report.  See **Document 3b**, Administrative Detention Order, attached to the Declaration of Monica Reckenwald.

8

On March 8, 2004, at approximately 7:50 a.m., a copy of the incident report was delivered to Plaintiff, and an investigation was conducted.  See **Document 3a** at pp. 1-2.  Plaintiff told the investigator the incident report was false, and he never said anything to the reporting officer.  Id., at p. 2.  At the conclusion of the investigation, the report was referred to the Unit Discipline Committee (UDC) for a hearing.  Id., at p. 2.

On March 9, 2004, at approximately 10:25 a.m., Plaintiff was removed from AD and returned to general population.  See **Document 1b.**

On March 10, 2004, a UDC hearing was conducted.  Plaintiff told the UDC, "No, it didn't happen."  At the conclusion of the hearing, the UDC determined Plaintiff committed the prohibited act of Refusing to Obey an Order (Code 307), and sanctioned him to six months loss of two-person room (ending September 2004).  See **Document 2a.**  The UDC's determination was based on the statement of the reporting staff member indicating he observed Plaintiff laying down, and Plaintiff's failure to produce any evidence to corroborate his statement that the incident did not occur.  Id.  At the conclusion of the hearing the UDC advised Plaintiff of its finding and of his right to appeal its determination within 15 calendar days of the date of the UDC hearing.  Id.  Plaintiff did not appeal the UDC's determination.  See **Document 1,** declaration of Joyce Horikawa.

9

On March 11, 2004, Plaintiff reported a medical emergency.  He indicated he was in pain because he was placed in SHU, where he was placed in handcuffs and forced to sleep on the floor.  He complained of pain in his lower back, left neck, and left scapula (shoulder blade).  He complained he had no medication, because his Naproxen was confiscated.  He also indicated that Naproxen did not help him very much.  He wanted his left arm in a flexed position, and reported his pain level increased from five to eight on a scale of one to ten.  On observation, Plaintiff was holding his left arm in a flexed position against his anterior torso.  He was in a wheelchair.  He felt pain upon palpation of the left trapezius, scapula, and left side of his neck.  It was noted Plaintiff's cerebral palsy was obvious.  His limbs had atrophied, and he had distorted posture.  He was assessed with cerebral palsy with exacerbation of pain and GERD.  His arm was placed in a sling.  A double mattress was ordered.  He was prescribed Naproxen, Zantac, Albuterol, and Azmacort.  It was noted these medications were confiscated upon Plaintiff's placement in the SHU and were not returned to him.  He was issued a two-week sling pass.  <u>See</u> **Document 2a**, at pp. 14, 39.

On April 1, 2004, Plaintiff complained of bleeding from his genitals for 17 days.  He reported a headache and regional pain at a level of five out of ten.  He denied trauma to the area where he was experiencing pain.  He denied knowledge of precipitating

factors except for having been forced to wear used underwear after he was returned to general population.  On examination, one inch erosive lesions were observed on his inner upper thighs bilaterally with exposure of sub-dermal tissue.  A sample of the discharge was taken and forwarded to the laboratory for analysis. He was assessed with skin ulcers, rule out cellulitis.  He was prescribed Keflex, Bacitracin ointment, and Betadine.  He was instructed on cleaning and re-dressing the affected area.  He was educated on treatment, his diagnosis and the medications.  Id., at p. 9.

On April 6, 2004, an administrative notation was entered into Plaintiff's records indicating the sample of the discharge material taken on April 1, 2004, tested positive for staphylococcus aureus of moderate growth.  It was noted Plaintiff was using Keflex on the wound area.  Id., at pp. 9, 24.

On April 8, 2004, Plaintiff indicated the ulcers were better, and he was experiencing itching.  He requested a medical note so he could be returned to a two-person cell (he was in a 10-person cell).  He stated he was frequently being "bumped" by all the men in his cell.  On examination, it was noted his left arm had atrophied with apparent inability to abduct his shoulder over 45 degrees, or to forward abduct his left arm over 45 degrees.  It also appeared he could not pronate or supinate his left arm.  There was increased pain to palpation of the entire left scapula,

acromion, lateral left clavicle, bicepital groove but no pain in the biceps, and pain at the left trapezius. He had poor to little muscle strength in his left arm and hand. It was also noted he had extreme hyper-reflexes at his left arm, and his right arm had normal reflexes. Plaintiff claimed a lack of vibration sensation and touch in his left arm. It was noted the erosive lesions observed on April 1, 2004, were healed, and some macular scaling had developed. He was assessed with erosive skin lesions of the inner thigh resolved, tinea cruces, cerebral palsy, and scoliosis. He was prescribed Tinactin cream. It was noted that Tinactin was sold at the Commissary; however, the prescription was issued because Plaintiff represented he was indigent. He was educated on his diagnoses, medical treatment, medications, and hygiene. He was instructed to follow-up as needed at sick call. The PA indicated he would discuss the request for a 2-person cell pass with a medical doctor and would submit a recommendation for a two room pass upon approval by a medical doctor. Id., at pp. 7-8.

In an administrative notation dated April 8, 2004, the PA indicated Plaintiff's request for a medical pass for placement in a two person cell was not approved by Health Services at that time. Id., at p. 8.

On April 8, 2004, a notation was entered by the Pharmacist indicating Plaintiff was not "indigent" and could be referred to the Commissary to purchase over the counter medications such as

Tinactin.  Id., at p. 8.

On April 21, 2004, Plaintiff was seen in the CCC where he complained of pain in his left elbow and left side of his back.  He complained he could not sleep.  He also complained Naproxen did not help him.  After an examination, he was assessed with cerebral palsy, asthma, and GERD.  He was prescribed Sulindac (also known as Clinoril), Albuterol, Azmacort and Ranitidine.  Id., at pp. 3-4.

On May 10, 2004, an administrative notation was entered indicating Plaintiff was to be discharged from the Bureau of Prisons and needed the following medications: (1) Sulindac; (2) Albuterol; (3) Azmacort; and (4) Ranitidine.  Id., at p. 1.  This is the last reported contact Plaintiff had with Health Services Staff at FCI McKean.  Id.

On May 11, 2004, Plaintiff was released from Bureau of Prisons custody via full term release.  See **Document 1a**, at p. 1.

## III.  **LEGAL ARGUMENTS**:

## **BIVENS CLAIMS**

### A.  **James Sherman May Not Be Sued In His Individual Capacity Pursuant To 42 U.S.C. § 1983**

Plaintiff asserts the court's jurisdiction over this case is pursuant to 42 U.S.C. § 1983.  42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

> subjected, any citizen of the United Sates or other
> person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress....

42 U.S.C. § 1983.

Section 1983 requires a defendant act under color of state law.  42 U.S.C. § 1983; <u>Kingsley v. Bureau of Prisons</u>, 937 F.2d 26, 30 n.2 (2d Cir. 1991).  Section 1983 therefore, does not subject federal employees to suit.  <u>See</u> <u>Robinson v. Overeas Military Corp.</u>, 21 F.3d 502, 510 (2d Cir. 1994).

In this case, there is no allegation Defendant Sherman acted under color of state law.  Indeed, Plaintiff cites no state law that was allegedly violated by Defendant Sherman.  Therefore all § 1983 claims against Defendant Sherman must be dismissed.

### B.    18 U.S.C. § 4042 Does Not Create A Private Right Of Action

Plaintiff asserts the court's jurisdiction over this case is pursuant to 18 U.S.C. § 4042.  § 4042 is a federal statute which sets forth the various duties of the Federal Bureau of Prisons.  For instance, Section 4042(a)(2) requires the Bureau provide "suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2).

However, this section does not create a private cause of action against the BOP or its officers and employees for their failure to

carry out the duties contained in it.  <u>See</u>, <u>Chinchello v. Fenton</u>, 805 F.2d 126, 134 (3d Cir. 1986); <u>Williams v. United States</u>, 405 F.2d 951, 954 (9th Cir. 1969); <u>Brown v. United States</u>, 324 F.Supp. 987, 992 (E.D. Ark. 1972), <u>aff'd in part</u>, <u>rev'd in part on other grounds</u>, 486 F.2d 284 (8th Cir. 1973);; <u>Harper v. Williford</u>, 96 F.3d 1526, 1527 (D.C.Cir. 1996).  More recently, in <u>Inciarte v. Spears</u>, <u>supra</u>, the United States District Court for the Southern District of New York dismissed a case filed by a federal inmate for lack of subject matter jurisdiction, upon finding no private cause of action existed under Section 4042.  <u>Id</u>., at *5.

Therefore, because 18 U.S.C. § 4042 does not create a private cause of action, Plaintiff's claim asserted under this statute must be dismissed for lack of subject matter jurisdiction.

**C.    This Case Should Be Dismissed For Plaintiff's Failure  To  Exhaust  His  Available Administrative Remedies**

This case should be dismissed, because Plaintiff failed to exhaust his available administrative remedies on any issues raised in the complaint prior to filing this civil action.

Under the Prison Litigation Reform Act, a prisoner must exhaust "such administrative remedies as are available" before bringing an action in federal court.  42 U.S.C. §1997e(a).  <u>Porter v. Nussle</u>, 122 S.Ct. 983 (2002); <u>Booth v. Churner</u>, 121 S.Ct. 1819 (2001).

15

In <u>Booth v. Churner</u>, 121 S.Ct. 1819, a unanimous Supreme Court held that Congress mandated completion of any prison administrative remedy process capable of addressing the inmate's complaint and providing some form of relief, "irrespective of the forms of relief sought and offered through administrative avenues." <u>Id</u>. at 1825. The administrative remedy system at issue in the case was nearly identical to the three-level system in use in the federal prison system. <u>See Booth v. Churner</u>, 121 S.Ct. at 1821.

More recently, in <u>Porter v. Nussle</u>, <u>supra</u>, the Supreme Court held the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

The Bureau of Prisons administrative remedy procedure is set out at 28 C.F.R. §542.10 <u>et seq</u>., and provides formal review of any complaint which relates to any aspect of the inmate's confinement. Under this process, inmates are encouraged to first attempt resolution of their complaints informally by discussing the matter with a member of their Unit Team. A record of that attempt is signed by the inmate and a member of the Unit Team. If informal resolution is insufficient to resolve the matter, the inmate may file a formal complaint with the Warden within fifteen days of the date on which the basis of the complaint occurred. 28 C.F.R. §542.13. If the inmate is not satisfied with the Warden's

response, he or she may appeal the response to the Regional Director.    If the inmate is dissatisfied with the regional response, he or she may file a national appeal with the Office of General Counsel in Washington, D.C.  28 C.F.R. §542.14.  Appeal to the Office of General Counsel is the final administrative appeal in the Bureau of Prisons.

In the ordinary course of business, computerized indexes of all administrative requests and appeals filed by inmates are maintained in the Bureau of Prisons nationwide computerized data base so rapid verification may be made as to whether an inmate has exhausted the administrative remedy process on a particular issue.  Also, hard copies of all administrative remedies that are filed through the Regional and Central Office levels are maintained at the Northeast Regional Office, so a review of the issues raised in each administrative remedy could be made.  After a review of the administrative remedy index for all administrative remedy requests and appeals filed by the Plaintiff, it was determined that Plaintiff had not filed any administrative remedy requests or appeals.  See **Document 1**, Declaration of Joyce Horikawa.

Therefore, because Plaintiff failed to exhaust his available administrative remedies before filing this civil action, the case should be dismissed pursuant to 42 U.S.C. §1997e(a).   Porter v. Nussle, 122 S.Ct. 983 (2002); Booth v. Churner, 121 S.Ct. 1819 (2001).

### D. Warden Sherman Should Be Dismissed, Because Plaintiff Has Failed To Allege He Was Personally Involved In The Alleged Unconstitutional Conduct

In a <u>Bivens</u> action, the complaint must allege specific actions committed by each defendant which violated Plaintiff's constitutional rights. <u>Alfaro Motors, v. Ward</u>, 814 F.2d 883 (2d Cir. 1987). Mere recitation of appropriate charging language, does not satisfy plaintiff's pleading requirements. <u>Dewick v. Village of Penn Yan</u>, 972 F.Supp 166 (W.D.NY 1997). It is well established that complaints relying on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have not meaning. <u>Barr v. Abrams</u>, 810 F..2d 358, 363 (2d Cir. 1987). [A]llegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983" <u>Alfaro Motors, Inc. v. Ward</u>, 814 F.2d 883 (2d Cir. 1987) (citations omitted). <u>See also</u> <u>Wright v. Smith</u>, 21 F.3d 496 (3d Cir. 1994); <u>Ostrer v. Aronwald</u>, 567 F.2d 551 (2d Cir. 1977).

In the instant action, the complaint has failed to allege a single unconstitutional act (or omission) committed by Defendant Sherman. Plaintiff merely alleges Warden Sherman was the Warden at FCI McKean during the time of the alleged events. He does not allege Defendant Sherman was personally involved in the alleged incidents or that he ordered, directed or acquiesced in the alleged

18

violation of Plaintiff's constitutional rights.  As stated above, conclusory allegations without supporting facts or allegations against each named defendant cannot form a <u>Bivens</u> claim upon which relief may be granted.  See <u>Martin v. Malhoyt</u>, 830 F.2d 237, 254 (D.C.Cir. 1987); <u>Williams v. Smith</u>, 781 F.2d 319, 323-24.

Therefore, because the complaint fails to allege any specific conduct Defendant Sherman engaged in to deprive Plaintiff of his constitutional rights, he should be dismissed.

### E.    Defendant Sherman Should Be Dismissed From This Law Suit Because A Supervisory Official Cannot Be Held Personally Liable Under The Theory Of Respondeat Superior

Plaintiff alleges his civil rights were violated, because he forced to sleep on a metal cot.  He also alleges that on March 7, 2004, he was subjected to excessive force by officers after he was observed failing to stand for the stand-up count in violation of prison rules.  Finally, he contends that during his placement in the Special Housing Unit (SHU), between March 7, 2004, and March 9, 2004, he was forced to sleep on a mattress on the floor, and he was denied adequate medical treatment.

Absent from the complaint is any allegation that Defendant Sherman had any personal involvement or knowledge of the alleged inadequate medical care, nor is there any allegation Defendant Sherman had a reason to know staff were deliberately indifferent to Plaintiff's serious medical needs.  To the extent the complaint can be read to imply that Defendant Sherman had some role in the

alleged violation of Plaintiff's constitutional rights by virtue of his supervisory position as Warden of FCI McKean, it is well settled that the doctrine of <u>respondeat superior</u> cannot form the basis of a <u>Bivens</u> claim. <u>Rizzo v. Goode</u>, 423 U.S. 362, 371 (1976); <u>Wright v. Smith</u>, 21 F.3d 496 (2d Cir. 1994); <u>Cameron v. Thornburgh</u>, 983 F.2d 253 (D.C. Cir 1993); <u>Noll v. Petrovsky</u>, 828 F.2d 461 (8th Cir. 1987), <u>cert. denied</u>, 484 U.S. 1014 (1988); <u>Farmer v. Carlson</u>, 685 F. Supp. 1335, 1338 (M.D.Pa. 1988). <u>Cf</u>. <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

In a <u>Bivens</u> action, the Plaintiff must plead and later prove some affirmative act or omission was committed by each individual defendant to submit him/her to personal liability for the actions of another person. <u>Brown v. Grabowski</u>, 922 F.2d 1097 (3d Cir. 1990), <u>cert. denied</u>, 111 S.Ct. 2827 (1991). Unless a plaintiff pleads an affirmative link between the supervisor's personal participation, his/her exercise of control or direction or his/her failure to supervise, a superior cannot be held liable for the acts of a subordinate in a civil rights action. <u>Baker v. Monroe Township</u>, 50 F.3d 1186, 1190-91 (3d Cir. 1995); <u>Haynesworth v. Miller</u>, 820 F.2d 1245 (D.C. Cir. 1987). See <u>Coleman v. Kay</u>, 87 F.3d 1491, 1507 (3d Cir. 1996) (supervisory liability will lie only where defendant "had actual knowledge of discriminatory conduct and acquiesced in it", <u>cert</u>. <u>denied</u>, ___ U.S. ___, 117 S.Ct 754, 136 L.Ed 2d 691 (1997); <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1478

(3d Cir. 1990); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).

In the instant action, Plaintiff fails to allege how Defendant Sherman was directly responsible for unconstitutional acts of others. Therefore, because <u>respondeat superior</u> cannot be used to impute personal liability on supervisory officials in civil rights claims, this claim should be dismissed as to Defendant Sherman.

**F.    Defendant Sherman Is Entitled To Dismissal On The Basis Of Qualified Immunity Since The Allegations Of The Complaint Do Not Amount To The Violation Of A Clearly Established Constitutional Right**

Defendant Sherman is entitled to dismissal from suit on the basis of qualified immunity. A federal government employee is generally entitled to immunity from suit for personal damages if his or her conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). <u>See</u> <u>Siegart v. Gilley</u>, 111 S.Ct. 1789 (1991); <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987); <u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985); <u>Davis v. Scherer</u>, 468 U.S. 183, 197 (1984). The qualified immunity defense in this context in "an immunity from suit rather than a mere defense from liability." <u>Mitchell v. Forsyth</u>, 472 U.S. at 526. In recognition of this, the Supreme Court has repeatedly stressed the desirability to resolve the qualified immunity issues at the earliest stage of litigation. <u>Hunter v. Bryant</u>, 112 S.Ct.

534, 536 (1991); <u>Anderson v. Creighton</u>, <u>supra</u>; <u>Mitchell v. Forsyth</u>, <u>supra</u>.

Once the individual defendants raise qualified immunity, courts must resolve two issues: 1) whether a constitutional right would have been violated on the facts alleged; and assuming the violation is established (from the pleadings), 2) whether the right alleged to have been violated was clearly established. <u>Saucier v. Katz</u>, 121 S.Ct. 2151(2001).

In <u>Saucier</u>, <u>supra</u>, the Supreme Court held that in a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. <u>Saucier v. Katz</u>, 121 U.S. at 2155.

The specific qualified immunity inquiry is twofold: First, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether

the right was clearly established. <u>Saucier</u>, 121 U.S. at 2155.
The relevant, dispositive inquiry in determining whether a right is
clearly established is whether it would be clear to a reasonable
officer that his conduct was unlawful in the situation he
confronted. <u>Saucier v. Katz</u>, 121 U.S. at 2156. <u>See</u> <u>Wilson v.
Layne</u>, 526 U.S. 603, 615 (1999).

An analysis of Plaintiff's claims against Defendant Sherman
reveals Plaintiff failed to state a constitutional violation,
because the complaint does not articulate what actions Defendant
Sherman personally committed to violate Plaintiff's constitutional
rights.

Even assuming <u>arguendo</u>, the complaint could be interpreted to
sufficiently state the commission of an unconstitutional act,
Plaintiff has failed to articulate how these constitutional rights
were clearly established. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640
(1987).

Accordingly, under the facts as alleged in the complaint,
Defendant Sherman is entitled to qualified immunity, and should be
dismissed from this lawsuit.

**G.    Plaintiff's Eighth Amendment Rights Were Not
       Violated**

Plaintiff alleges he was denied appropriate medical treatment
at FCI McKean because he was forced to sleep in a metal cot,
because staff used excessive force when he failed to stand for the
stand up count, and because during his placement in the SHU, he was

23

forced to sleep on a mattress on the floor, and was denied adequate medical treatment.

Claims asserting the denial of adequate medical care are governed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97 (1976); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 254 (3d Cir. 1979). A prison official violates the Eighth Amendment only when two requirements are met. First the deprivation alleged must be objectively, "sufficiently serious." Wilson v. Seiter, 501 U.S. 294 (1991). In order to satisfy this prong, the inmate must show the principle that he is incarcerated under conditions posing a substantial risk of serious harm. See Helling v. McKinney, 509 U.S. ___, 113 S.Ct 2575, 125 L.Ed.2d 22 (1993). The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." Estelle, supra., at 1104. In prison conditions cases, that state of mind is one of "deliberate indifference" to inmate health and safety. Wilson , supra., 501 U.S., at 302-303. The Supreme Court has held that deliberate indifference is established when prison officials fail to take reasonable measures to abate a known substantial risk. In Farmer v. Brennan, 114 S.Ct. 1970, 1984 (1994), the Court explained:

> a prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards
> an excessive risk to inmate health or safety; the
> official must both be aware of facts from which the
> inference could be drawn that a substantial risk of

24

> serious harm exists, and he must also draw the
> inference...but an official's failure to alleviate a
> significant risk that he should have perceived but did
> not, while no cause for commendation, cannot under our
> cases be condemned as the infliction of punishment.

<u>Farmer v. Brennan</u>, 114 S.Ct. at 1979.

A review of Plaintiff's medical record indicates there was no medical information indicating Plaintiff could not sleep on a metal cot or that he cold not sleep on a mattress on the floor of a cell. <u>See</u> **Document 2a**. Although it is true that on January 22, 2004, a medical slip was issued indicating Plaintiff should be issued the thickest mattress available, there was no medical restriction as to the particular bed type. <u>Id</u>.

With respect to the excessive force allegation, the evidence indicates that on February 7, 2004, at 4:15 p.m., Plaintiff refused to stand for the 4:00 p.m. stand up count. <u>See</u> **Document 3a**. The evidence shows that when Plaintiff was ordered to get out of his bed, he layed in his bed. Upon being given a second direct order to stand for the count, Plaintiff stated, "This is bullshit." <u>Id</u>., at p. 1. After Plaintiff's refusal to obey the second direct order to stand for the count, the count had to be stopped. <u>Id</u>. The evidence indicates that at approximately 5:00 p.m., that date, Plaintiff was handcuffed from behind, and escorted to Administrative Detention (AD), pending investigation for violating prison rules. <u>See</u> **Document 3b.** During the investigation, Plaintiff told the investigating Lieutenant the report was false, and when

the reporting officer kicked the door, he got up and turned the lights on. See **Document 3a**, at p. 2. During the Unit Discipline Committee (UDC) hearing, Plaintiff simply denied the incident occurred. He did not indicate his physical condition or the medications he was taking rendered him unable to stand for the count. Id.

The evidence thus indicates that on March 7, 2004, Plaintiff was issued an incident report for failing to stand for the stand up count. See **Document 3a**, at p. 1. Absent from the evidence is any indication Plaintiff was unable to stand from the count due to his medical issues and/or medications he was taking. Id., at p. 2. With respect to Plaintiff's allegation he was unconstitutionally handcuffed behind his back, there is no evidence of a medical prohibition regarding the use of restraints. See **Document 2a**. Indeed, noticeably absent from the inmate transit form is any information regarding special needs or special equipment required for transporting Plaintiff. Id., at p. 21.

The conditions of the Special Housing Unit (SHU), are set forth at 28 C.F.R. §§ 541. 21, 541.22(d). With respect to bedding, the regulations provide, "An inmate in segregation may wear normal institution clothing but may not have a belt. Staff shall furnish a mattress and bedding... An inmate may not be segregated without clothing, mattress, blankets and pillow, except when prescribed by the medical officer for medical or psychiatric reasons. 28 C.F.R.

§ 541,21(c)(3).

In this case, Plaintiff does not indicate he was denied a mattress and clothing. <u>See</u> **Complaint** at ¶ 9. That he may have been relegated to sleeping on a mattress on the floor for the two nights he was assigned to the SHU is not a per se violation of prison regulations.

With respect to medical care, the regulations provide, "In addition to the direct supervision afforded by the unit officer, a member of the medical department and one or more responsible officers designated by the Warden (ordinarily a Lieutenant), shall see each segregated inmate daily, including weekends and holidays. Members of the program staff, including unit staff, shall arrange to visit inmates in special housing within a reasonable time after receiving the inmate's request."  28 C.F.R. § 541.21(c)(9).

In this case, the evidence shows there was no medical order forbidding Plaintiff from sleeping on a mattress placed on the floor.  Moreover, if Plaintiff felt he was medically unable to sleep on a mattress on the floor, he could have brought this issue to the attention of SHU officers, medical staff or other staff designated by the Warden during their daily rounds.  There is no indication Plaintiff did that.

Even assuming <u>arguendo</u>, Plaintiff's allegations could be construed as alleging medical staff did not conduct daily rounds (which is not conceded), absent from the complaint is any

allegation that other staff failed to make daily rounds, or that Plaintiff made any request for medical assistance. See **Complaint at ¶ 9.**

Plaintiff's records indicate that he was placed in the SHU on March 7, 2004, at approximately 5:00 p.m., and he was released to General Population on March 9, 2004, at approximately 10:25 a.m. See **Document 1b.** After Plaintiff's release to general population, he waited until March 11, 2004, to report pain incident to his placement in the SHU, being cuffed frequently, and sleeping on the floor. See **Document 2a** ,at p. 14. Upon receiving this medical complaint, medical staff examined him, placed his arm in a sling for two weeks, ordered that he be issued a double mattress, and issued him appropriate medications. Id., at p. 14. After receiving this medical treatment, Plaintiff did not return to Health Services with a medical complaint until April 1, 2004, when he complained of irritation incident to a staph infection. Id., at p. 10.

Plaintiff's medical record quite clearly indicates that each time Plaintiff reported medical problems to staff at FCI McKean, he received prompt, diligent, and appropriate medical attention. See **Document 2a.**

Nothing in the record indicates that either Defendant Sherman or any member of FCI McKean medical staff was deliberately indifferent to Plaintiff's serious medical needs. See **Documents**

**2a.** Although Plaintiff complains generally of conditions he labels sadistic, the evidence fails to corroborate this characterization of his treatment at FCI McKean.

Also, with respect to Defendant Sherman, there is no evidence in the record that he in any way denied medical care to Plaintiff. See **Document 2a.** Although Plaintiff argues that because he was incarcerated at FCI McKean in 1998, Warden Sherman had prior notice of his special needs, the evidence indicates Warden Sherman did not arrive at FCI McKean for purposes of employment until January 25, 2004. See **Document 4.**

That Plaintiff is not satisfied with the level of medical attention or the promptness in which such attention was offered to him does not automatically give rise to a constitutional violation. In Estelle, supra, the court explained:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind' .. [I]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.

Estelle, 429 U.S. at 105-106.

Therefore, because Plaintiff received medical treatment that was consistent with evolving standards of decency, his allegation that charging deliberate indifference should also be dismissed.

**FTCA CLAIMS**

>    **A.    This Civil Action Should Not Be Construed Under The Provisions Of The Federal Tort Claims Act Because Plaintiff Has Alleged Constitutional Violations**

This civil action should not be construed pursuant to the provisions of the Federal Tort Claims Act. 28 U.S.C. 2672, <u>et</u> <u>seq</u>. (FTCA), because, Plaintiff has not alleged a cause of action in tort cognizable under state common law.

Under the FTCA the United States is liable for personal injury caused by the negligent or wrongful acts or omissions of a government employee acting within the scope of his/her office or employment. 28 U.S.C. § 2674; 28 U.S.C. § 1346(b). <u>See</u> <u>generally</u>, <u>Carlson v. Green</u>, 446 U.S. 14 (1980); <u>Logue v. United States</u>, 412 U.S. 521 (1973); <u>United States v. Muniz</u>, 374 U.S. 150 (1963); <u>Feres v. United States</u>, 240 U.S. 135 (1950).

In this case, Plaintiff alleges Defendant Sherman was deliberately indifferent to his serious medical needs by forcing him to sleep on a metal bed, placing Plaintiff in the SHU for just over two days, and denying him appropriate medical care while Plaintiff was in the SHU. An allegation of deliberate indifference is an allegation of a violation of the Eighth Amendment. <u>See Farmer v. Brennan</u>, 114 S.Ct. 1970, 1984 (1994).

Under the FTCA, the liability of the United States does not apply to federal constitutional or statutory rights. 28 U.S.C. § 2679(b)(2)(A). Absent from Plaintiff's allegations are allegations

of negligence or of any other tort cause of action cognizable under Pennsylvania law.

Therefore, because allegations of a federal employee's deliberate indifference are more appropriately brought against the federal employee in his/her individual capacity under the Eighth Amendment, this case should not be construed as a cause of action under the FTCA.

**B.    To The Extent This Complaint Can Be Interpreted Under The Federal Tort Claims Act Defendant Sherman In His Personal Capacity Should Be Dismissed From The Case As The Only Proper Defendant Is The United States**

A civil action filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2672 et seq., is a suit against the United States. The FTCA is a limited waiver of sovereign immunity of the United States of America. <u>United States v. Orleans</u>, 452 U.S. 807 (1976). As sovereign, the United States is immune from suit except as it consents to be sued, and the terms of its consent, as set forth by Congress, define the limits of the federal courts' subject matter jurisdiction to decide suits brought against it. <u>Honda v. Clark</u>, 386 U.S. 484 (1967); <u>United States v. Sherwood</u>, 312 U.S. 584 (1941). The FTCA does not create any substantive causes of action against the United States, rather it establishes a procedure for remedy. <u>Richards v. United States</u>, 369 U.S. 1 (1969); <u>Dalhite v. United States</u>, 346 U.S. 15 (1953); <u>Feres v. United States</u>, 240 U.S. 135 (1950).

Under the FTCA the United States is liable for personal injury caused by the negligent or wrongful acts or omissions of a government employee acting within the scope of his/her office or employment.  28 U.S.C. § 2674; 28 U.S.C. § 1346(b).  The FTCA is a limited waiver of the United States of sovereign immunity.  This limited waiver of sovereign immunity does not extend to the various agencies and Bureaus of the United States or employees acting in their official capacities.  See generally, Carlson v. Green, 446 U.S. 14 (1980); Logue v. United States, 412 U.S. 521 (1973); United States v. Muniz, 374 U.S. 150 (1963); Feres v. United States, 240 U.S. 135 (1950).

Therefore, because the United States is the only proper defendant in a civil action filed under the provisions of the FTCA, Defendant Sherman should be dismissed from this case.

**C.    The Complaint Should Be Dismissed Because Plaintiff Has Not Established A Prima Facia Case Of Medical Malpractice Under Pennsylvania State Law**

Summary Judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©).  The moving party bears the initial burden of identifying evidence that demonstrates the absence of any genuine issue of material fact.  Once that burden has been met, the non-

moving party must set forth "specific facts showing that there is a genuine issue for trial..." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  See Matsushita Elec. Ind. Company v. Zenith Radio Corp., 475 U.S. 574 (1986).  If a court, having reviewed the evidence with this standard in mind, concludes that the "evidence is merely colorable...or is not significantly probative," then summary judgment may be granted.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  In addition, when the record is such that it would not support a rational finding that an essential element of the nonmoving party's claim or defense exists, summary judgment must be entered for the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

Plaintiff brings this claim pursuant to the FTCA, 28 U.S.C. § 2671.  The FTCA allows private individuals to bring suits against the United States for torts committed by its employees acting within the scope of their employment.  See Bialowas v. United States, 443 F.2d 1047 (3d Cir. 1971).  Under the FTCA, the United States may be held liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.  The liability of the United States is determined by the law of the state where the alleged tortious conduct occurred. United States v. Muniz, 374 U.S. 150, 152 (1963) (citing 28 U.S.C. §1364(b)).  Consequently, in this case, the laws of Pennsylvania,

specifically the law of medical malpractice, determines the liability of the United States.

Under Pennsylvania law, a plaintiff in a medical malpractice case must first establish a <u>prima</u> <u>facie</u> case of malpractice. To accomplish this, the plaintiff must produce evidence that establishes (1) the applicable standard of medical care accepted by the medical community, (2) that the care provided to the plaintiff deviated and fell below the standard of care, and (3) that the injury complained of resulted from that failure. <u>Titchnell v. United States</u>, 681 F.2d 165, 166 (3d Cir. 1982).

Most importantly, Pennsylvania law requires that a plaintiff produce expert testimony that shows the physician's conduct at issue in the case varied from accepted medical practice. Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of a lay persons, allegations of medical malpractice generally may <u>not</u> be proven without the testimony of "an expert witness who will testify, to a reasonable degree of medical certainty, that the act of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." <u>See</u> <u>Gindrow v. Densler</u>, 967 F.Supp 833 (E.D.Pa. 1997) (<i>quoting</i>, <u>Mitzelfelt v. Kamren</u>, 526 Pa. 54,62, 584 A.2d 888, 892 (1990)). A very narrow exception to the requirement of expert testimony in medical malpractice actions applies only where "the matter is so simple, or

the lack of skill or care so obvious, as to be within the range of experience and comprehension of even non-professional persons." See Toogood v. Rogal, 2003 WL 21241255 (Pa. 2003)(quoting, Hightower-Warren v. Silk, 548 Pa. 459, 698 A.2d 52, 54 n.1 (1997)); Brannan v. Lankenau Hospital, 498 Pa. 588, 598, 417 A.2d 196, 201 (Pa. 1980).

Moreover, in addition to the requirement of expert testimony on the underlying issue of whether the defendant acted negligently, expert testimony is required to establish a causal connection between the defendant's alleged negligent acts and the plaintiff's injuries. Dornon v. Johnston, 421 Pa. 58, 218 A.2d 808 (1966)(Where factual relationship between negligent act and injury is sufficiently obscure that laymen are unable to make reasonable determinations as to its existence, expert guidance is needed). In other words, to prove a claim of medical malpractice, a plaintiff must produce expert testimony that demonstrates to a reasonable degree of medical certainty that the acts alleged deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. See Mitzelfelt, 526 Pa. 54, 584 A.2d 888 (1990). Failure to meet this burden amounts to a failure to create a genuine issue of material fact, thus warranting entry of summary judgment in favor of defendant.

In the Complaint, Plaintiff does not identify any medical expert or attach an expert report. Instead, he merely alleges the

following: Defendant failed to meet the medical and other special needs and assistance of a disabled prisoner.

Plaintiff has not identified an expert or provided an expert report to the United States or to the court. Expert testimony is crucial to a proper understanding of the issues of negligence and causation in this case. The Supreme Court of Pennsylvania emphasized in <u>Toogood</u>, "We reaffirm our earlier conclusion, set forth in numerous decisions of the Court that, medicine being an applied science, the realm of reasonable choice is best defined by those engaged in the practice, and expert medical testimony on this issue is required." <u>Toogood</u>, 824 A.2d 1140, 1148.

In short, the law in Pennsylvania is clear concerning a plaintiff's burden of proof in medical malpractice cases. The plaintiff must establish both a <u>prima</u> <u>facie</u> case of negligence, and that such negligence was the proximate cause of their injuries. The only way to meet this burden is through an expert that testifies to a reasonable degree of medical certainty that such is the case. <u>Tarter v. Linn</u>, 396 Pa.Super. 155, 578 A.2d 453 (1990)("The Pennsylvania Supreme Court has expressly held in malpractice cases, a jury will not be permitted to find negligence without expert testimony to establish variance from accepted medical practice"). In this case, however, Plaintiff has failed to meet this burden, and without a genuine issue of material fact on the issue of medical malpractice, summary judgment is appropriate

36

for Defendant.

    **D.**   **There Is No Evidence Of Medical Malpractice**

    To the extent Plaintiff alleges medical staff at FCI McKean were negligent, because they did not issue medical slips prohibiting him from being handcuffed behind his back or prohibiting him from being assigned to bedding on the floor as opposed to a bed, or because he was not provided adequate medical care while he was housed in the SHU, his claim lack merit, because the medical records do not support such a conclusion. <u>See</u> **Document 2a.**

    A civil action filed under the Federal Tort Claims Act, 28 U.S.C. § 2670 <u>et</u> <u>seq</u>., is a suit against the United States.  The FTCA provides that the United States shall be liable for personal injury caused by the negligent or wrongful act or omission of a government employee acting within the scope of office or employment, under circumstances where a private person would be liable in accordance with the laws of the state where the injury occurred.  28 U.S.C. § 2674; 28 U.S.C. § 1346(b).  This principle has been recognized by the Supreme Court in numerous cases. <u>Carlson v. Green</u>, 446 U.S. 14 (1980); <u>Logue v. United States</u>, 412 U.S. 521 (1973); <u>United States v. Muniz</u>, 374 U.S. 150 (1963); <u>Feres v. United States</u>, 240 U.S. 135 (1950).

    Under the FTCA, the United States is only liable to the same extent as a private person in accordance with the law of the place

where the act or omission occurred.   28 U.S.C. § 1346(b) and §
2674.  Thus, because Plaintiff alleges medical malpractice arose at
FCI McKean, Pennsylvania, this case is governed by Pennsylvania
law.

Under Pennsylvania law, to sustain a cause of action for
medical malpractice, a plaintiff must establish the following five
elements: (1) the physician owed a duty to the patient; (2) the
physician breached that duty; (3) the breach of duty was the
proximate cause of, or a substantial factor in, bringing about the
harm suffered by the patient; and (4) the damages suffered by the
patient were a direct result of that harm.  Moreover, as stated
earlier, the Plaintiff must offer an expert witness who will
testify to a reasonable degree of medical certainty, that the acts
of the physician deviated from good and acceptable medical
standards, and that such deviation was the proximate cause of the
harm suffered.  Rauch v. Mike-Meyer, 783 A.2d 815, 824 (Pa.Super
1987); Wolloch v. Aiken, 756 A.2d 5, 14-15 (Pa.Super. 2000).
Compare Hightower-Warren v. Silk, 548 Pa. 459, 463 n.1, 698 A.2d
52, 54 n.1 (Pa. 1997)(expert medical testimony is not required if
a matter is so simple or the lack of skill or care is so obvious as
to be within a lay person's range of experience and comprehension).

In this case, Plaintiff has failed to establish a prima facie
case of medical malpractice under Pennsylvania law, because he has
failed to offer expert testimony establishing the requisite

elements of medical malpractice.

The available evidence shows that Plaintiff was a federal inmate with a history of cerebral palsy, scoliosis, GERD, asthma, and adjustment disorder. See **Document 2a**, at pp. 29-33. Plaintiff's medical transit form indicated that aside from his numerous medical issues and medications, he had no travel limitations and did not require any special equipment. Id., at p. 21.

Upon his arrival at FCI McKean on December 16, 2003, Plaintiff had a medical intake screening examination, during which staff were able to confirm the medical issues listed on the transit form, prescribe appropriate medications, issue special passes for work restriction, lower bunk assignment, unlimited wheelchair use, and soft shoes. Id., at pp. 37-39. Plaintiff was assigned to the Chronic Care Clinic (CCC) so his medical status could be regularly monitored between his sick call appointments. Id., at p. 20, 30, 32.

On January 26, 2004, he complained to a Physician's Assistant (PA) that he was experiencing back pain and "paralysis" because his mattress was too thin. Id., at p. 13. In response, the PA indicated he would check the mattress issue with the staff physician. It was later noted the mattress issue was forwarded to the Unit Team for resolution. Id., at p. 13. In a second entry, it was noted that Plaintiff's Unit Manager issued Plaintiff two

mattresses, and would issue an old style fabric mattress to Plaintiff upon request. Id., at p. 14.

Plaintiff did not return with any medical complaints until March 11, 2004, two days after he was released from the his two night assignment to the SHU. Id., at p. 14. During the March 11, 2004 visit, Plaintiff complained of increased pain due to the conditions during his brief SHU assignment. He was prescribed medications and was issued a two week arm sling pass. Id., at p. 14. After Plaintiff's March 11, 2004 visit to the Health Services Unit, he did not return for medical attention until April 1, 2004, nearly three weeks later.

During the April 1, appointment, he complained that for 17 days, he was bleeding from his genitals. Id., at p. 9. Once more, medical staff examined him and sent of culture of the affected area for testing. As a precautionary measure, he was given Keflex and Bacitracin ointment, and instructed on cleansing and dressing the affected area. Id., at p. 9. On April 6, 2004, the result of the culture indicated Plaintiff had a staph infection. By April 8, 2004, Plaintiff reported the skin ulcers had improved, and it was observed the lesions had healed. Id., at pp. 7-8.

Plaintiff's April 8, 2004 medical appointment was significant in two other respects. First, it is noted that during this appointment, Plaintiff sought a medical pass to be returned to a two person cell, because inmates in his 10-person cell were

"bumping" him.  Id., at p. 7.  This is an example of Plaintiff's use of his medical condition to circumvent a duly-imposed sanction (six months loss of a two person cell) for refusing an order to stand for the count.  See **Document 3a**.  Plaintiff's request was inappropriate, because it was not based on a medical need, but a personal preference that he not be assigned to a 10-person cell.  Second, during this medical appointment Plaintiff was issued a prescription for Tinactin, based on his false representation that he lacked sufficient funds to purchase the Tinactin at the Commissary.  It was later discovered he did have the funds, and he was referred to the Commissary to purchase Tinactin with his own funds.  See **Document 2a**, at pp. 7-8.

The medical records are remarkable for the absence of evidence of negligence.  That Plaintiff was not satisfied with his two night placement in the SHU, and his subsequent assignment to a 10-person cell is not evidence of a breach of community standards of medical care.  Indeed, the evidence shows that each time Plaintiff presented a health concern, he was treated appropriately and provided with appropriate medications.  Id.  There is no indication that Health Services staff did not take clinically-appropriate measures in response to Plaintiff's complaints.  Id.

Therefore, because Plaintiff has failed to allege facts sufficient to establish a prima facie case of medical malpractice against Bureau of Prisons medical staff, Plaintiff's medical

41

malpractice claim must be denied.

   **E.    The Use Of the Restraints Applied Behind The
          Back Of The Placement Of Plaintiff's Mattress
          On The Floor Of His Cell During His Two Night
          Assignment To The SHU Does Not Amount To
          Negligence**

   Plaintiff alleges that the use of hand restraints applied
behind the back and the placement of his mattress on the floor of
his cell in SHU during his two night assignment in the SHU amounted
to negligence.  This claim lacks merit.

   The evidence shows that on March 7, 2004, Plaintiff refused to
stand for the 4:00 p.m. stand up count.  See **Document 3a**.  After he
was ordered twice to stand for the count, he became insolent to
staff.  Id.  There is no indication from the incident reports or
from Plaintiff's statements to the investigating staff member and
the Unit Discipline Committee (UDC), that his medical condition or
medication rendered him incapable of standing.  Id.  As a result of
Plaintiff's own actions of being insolent, he was placed in AD
pending investigation into the incident.  See **Document 3b**.

   Absent from the medical record, including the Medical Summary
of Federal Prisoner/Alien in Transit Form, despite Plaintiff's
numerous medical issues, there was no medical preclusion
restricting him from being handcuffed from behind or from being
assigned, at least temporarily, to a floor mattress.  See **Document
2a**, at p. 21.  Although the conditions may subjected Plaintiff to
two nights of discomfort, these conditions and/or discomfort did

not result in injury.  See **Document 2a**, at pp. 1-14.  Indeed, Plaintiff waited approximately three days after his release from the SHU to report increased pain.  Id., at p. 14.  Upon examination, Plaintiff was prescribed appropriate medications, a double mattress, and was issued a two week pass for an arm sling. After March 11, 2004, Plaintiff did not return to complain of increased pain connected with the conditions of his SHU placement. See **Document 2a**, at pp. 1-11.

Therefore, Plaintiff has not established a breach of duty or damages with respect to the March 7, 2004 incident in which he was removed from general population and placed in SHU, or from his two night placement in SHU, he has failed to established negligence on the part of staff at FCI McKean.  Accordingly, this case should be dismissed upon the filing of a Motion for Summary Judgment.

IV.  <u>**CONCLUSION**</u>

For all of the above stated reasons, It is recommended that a motion to dismiss be filed.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney

 s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7337
PA ID No. 56668

**CERTIFICATE OF SERVICE**

       I hereby certify that a true and correct copy of the within MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT was served by mail upon the following:

                Marc Shatkin, Esquire
                SHATKIN & SHATKIN
                434 Delaware Avenue
                Buffalo, NY 14202


                _s/ Michael C. Colville_
                MICHAEL C. COLVILLE
                Assistant U.S. Attorney

Date:  August 1, 2005